UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANNY LEE SAINTIGNON, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00334-JMS-MG |
| | ) | |
| WEXFORD OF INDIANA, LLC, | ) | |
| NAVEEN RAJOLI, | ) | |
| TAYLOR HILL, | ) | |
| CHANTELL KNEPP, | ) | |
| CHELSEY PEARISON, | ) | |
| BARBARA RIGGS, | ) | |
| S. BYRD, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Danny Lee Saintignon, Jr., a prisoner at Wabash Valley Correctional Facility, is suing Wexford of Indiana, LLC, and its employees for deliberate indifference to a serious medical need in violation of the Eighth Amendment. Mr. Saintignon claims that the defendants provided little to no care for his Covid-19 symptoms for four to six weeks in December 2020 and January 2021. The defendants have moved for summary judgment, arguing that the treatment they provided was reasonable and appropriate given that Covid-19 is a novel illness for which there is no cure or standard treatment.

As explained below, the evidence supports a reasonable conclusion that the defendants persisted in a course of ineffective treatment for over a month while Mr. Saintignon experienced severe Covid-19 symptoms, that reasonable alternatives were available, and that they failed to

pursue these alternatives out of deliberate indifference to Mr. Saintignon's serious medical need. Accordingly, the defendant's motion for summary judgment is **DENIED**.

## I. SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II. Factual Background

Mr. Saintignon came down with Covid-19 in December 2020. (Dkt. 32). His initial symptoms included body chills, hot and cold sweats, and body aches. (Dkt. 51-8 at 7). He quickly developed additional symptoms, including severe headaches, high fever, and a complete loss of taste and smell. (*Id.*). About a week later, he developed chest pains and difficulty breathing. (*Id.*). Many of his symptoms subsided after a month or two, but as of May 2022, he still used an inhaler for shortness of breath and difficulty breathing. (Dkt. 61-1 at 6-7).

In this lawsuit, Mr. Saintignon has named four categories of defendants: (1) Wexford of Indiana, LLC, a corporation that at all relevant times to this lawsuit provided medical services to prisoners at the Indiana Department of Correction; (2) Nurse Barbara Riggs, who allegedly conducted his Covid-19 test swab on December 10, 2020; (3) Nurse Chelsey Pearison, Nurse Taylor Hill, and Nurse Chantell Knepp, who worked on the med line distributing medication to inmates in Mr. Saintignon's housing unit in December 2020 and January 2021; and (4) Dr. Samuel Byrd and Dr. Naveen Rajoli, who served as Mr. Saintignon's treating physicians in December 2020 and January 2021. (Dkt. 32).

### A. Covid-19

Covid-19 is a disease caused by the virus SARS-CoV-2. It can be very contagious and spreads quickly. Since its emergence in early 2020, Covid-19 has killed over one million people in the United States.[1]

Symptoms of Covid-19 include fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, loss of taste or smell, sore through, congestion

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19.html (last visited 8/7/23).

or running nose, and other symptoms. Patients should seek emergency medical attention if they have trouble breathing or persistent pain or pressure in the chest.[2]

### B.  Wexford's Treatment of Patients with Covid-19

In December 2020, Wexford was testing and isolating patients with Covid-19 in accordance with Indiana Department of Correction ("IDOC") policies. (Dkt. 51-2 at ¶ 4). Inmates in the Wabash Valley Control Unit, such as Mr. Saintignon, were already isolated in solitary confinement and were not moved upon testing positive for Covid-19. (*Id.* at ¶¶ 3, 7).

Typically, patients were advised to increase their water intake, rest, and were offered Tylenol to address any complaints of pain or to reduce a fever. (*Id.* at ¶ 8). Further medication could be prescribed on a case-by-case basis to address any serious symptoms that presented. (*Id.*).

### C.  Mr. Saintignon's Early Symptoms and Covid-19 Test with Nurse Riggs

Mr. Saintignon began feeling ill around December 4, 2020. (Dkt. 61-1 at 3). On December 8, 2020, he submitted a Request for Health Care form, stating, "For about the last 3-4 days, I've been having a really high fever (hot + cold chills) and coughing as well as shortness of breath. I need a COVID test." (*Id.* at 16).

On December 10, 2020, Mr. Saintignon received a Covid-19 test, which was performed by Nurse Riggs and another nurse. (*Id.* at 4). After the test, Mr. Saintignon asked Nurse Riggs if there was anything that might alleviate his symptoms. (*Id.*). Nurse Riggs stated, "you do show symptoms of Covid-19[,] but the doctor is overwhelmed with Covid cases[,] so wait your turn." (*Id.*). Nurse Riggs did not provide Mr. Saintignon with anything that might relieve his immediate symptoms, such as Tylenol, a cold compress, or other over-the-counter remedies. (*Id.*).

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited 8/7/23).

4

On December 12, 2020, Mr. Saintignon received six 325 mg Tylenol pills. (*Id.*). This medication was the first treatment he received for his Covid-19 symptoms. (*Id.*).

On December 14, 2020, Mr. Saintignon's test results came back and showed that he was positive for Covid-19. (Dkt. 51-1 at 18).

### D.  Mr. Saintignon's Interactions with the Med Line Nurses

The Control Unit, where Mr. Saintignon was housed in December 2020 and January 2021, was a restricted housing unit. (Dkt. 51-2 at ¶¶ 3, 7). Typically, in restricted housing units, medication is administered by nurses during "med line." (Dkt. 51-3 at ¶ 6). During med line, a nurse goes from cell-to-cell to deliver medications to the patients. (*Id.*). The med line nurses do not typically provide additional medical care. (*Id.* at ¶ 8). If a patient asks for additional medical care, the med line nurse will typically direct him to complete a Request for Health Care form. (*Id.*). The only exception to this practice occurs when a patient presents with an emergent condition that requires immediate attention, such as active bleeding or a heart attack. (*Id.*).

Defendants Nurse Pearison, Nurse Knepp, and Nurse Hill were med line nurses in the Control Unit in December 2020. (Dkt. 55-3 at ¶ 9); (Dkt. 55-4 at ¶ 6); (Dkt. 55-5 at ¶ 6). These defendants do not recall their interactions with Mr. Saintignon during this timeframe. (Dkt. 55-3 at ¶ 15); (Dkt. 55-4 at ¶ 14); (Dkt. 55-6 at ¶ 14).

According to Mr. Saintignon, he saw various nurses during med line at least twice daily, including Nurse Pearison, Nurse Knepp, and Nurse Hill. (Dkt. 61-1 at 5). He told these nurses that Tylenol was not effectively treating his symptoms and that he had chest pain and difficulty breathing. (*Id.*). Nurse Pearison, Nurse Knepp, and Nurse Hill did not provide emergency treatment or contact a physician. (*Id.*). Instead, each of these defendants told him "to lay down and get some rest and that there was nothing else that could really be done about it." (Dkt. 51-8 at 4).

**E.  Mr. Saintignon's Interactions with Dr. Rajoli and Dr. Byrd**

On December 15, 2020, Mr. Saintignon saw Dr. Rajoli at an appointment for chronic heartburn (gastroesophageal reflux disease, or GERD). (Dkt. 51-1 at 14-16); (Dkt. 61-1 at 5). During this appointment, Mr. Saintignon told Dr. Rajoli that he was positive for Covid-19; that he had only received six Tylenol to treat his extreme pain, chest pain, and shortness of breath; and that Tylenol was ineffectively managing these symptoms. (Dkt. 61-1 at 5). Dr. Rajoli took no action with respect to Mr. Saintignon's Covid-19 symptoms, aside from telling him to "get some rest," and he did not record Mr. Saintignon's Covid-19 symptoms in the medical record for this appointment. (Dkt. 51-1 at 14-16); (Dkt. 61-1 at 5).[3]

On December 16, 2020, Mr. Saintignon submitted a Request for Health Care form, stating, "I was given 6 Tylenol pills yesterday, and they haven't really done any good. My body is aching, and my joints are hurting as well." (Dkt. 51-1 at 23) (cleaned up).

On December 18, 2020, Mr. Saintignon submitted another Request for Health Care form, stating, "I've been having real bad chest pains, shortness of breath. I'm feeling like I just ran a half-mile, constantly." (*Id.* at 21).

On December 18, 2020, a nurse assessed Mr. Saintignon and wrote in the medical record that he "continues to have body aches and [shortness of breath]." (*Id.* at 11). Dr. Byrd ordered more Tylenol and a chest x-ray (*Id.* at 19); (dkt. 55-7 at ¶ 9). The chest x-ray returned normal. (Dkt. 55-1 at 19); (Dkt. 55-7 at ¶ 9).

---

[3] In his affidavit, Dr. Rajoli states that he did not observe any serious or significant symptoms of Covid-19 during this appointment. (Dkt. 51-2 at ¶ 9). Because the defendants have moved for summary judgment, the Court accepts Mr. Saintignon's version of events as true for purposes of this Order. *Khungar*, 985 F.3d at 572-73.

On December 24, 2020, Dr. Byrd ordered a 30-day supply of Tylenol, which he states "was the standard treatment for Covid-19." (Dkt. 55-7 at ¶ 9).

On December 29, 2020, Mr. Saintignon filed another Request for Health Care form, stating, "I'm still having trouble breathing. I have pain in my chest when I breath[e] in and I've been hacking up a lot of mucus. I don't know if it's after [e]ffects from the Covid-19 or what but it don't seem to be going away." (Dkt. 55-1 at 20).

On December 31, 2020, Mr. Saintignon had an appointment with a nurse to address his Covid-19 symptoms. (*Id.* at 7-9). In addition to the symptoms described in the December 29 Request for Health Care form, the nurse recorded that Mr. Saintignon had swollen tonsils, inflammation, wheezing during exhales, and enlarged cervical lymph nodes. (*Id.* at 8). "[A] physician" ordered additional Tylenol and doxycycline (antibiotic). (*Id.* at 9); (Dkt. 51-2 at ¶ 12); (Dkt. 51-7 at ¶ 11). Dr. Rajoli and Dr. Byrd believe that prescribing doxycycline was "an appropriate step, given that Mr. Saintignon was reporting difficulty breathing with a productive cough and slight wheezing while exhaling, all consistent with an upper respiratory infection and given the duration of symptoms was approaching two weeks." (Dkt. 51-2 at ¶ 12); (Dkt. 51-7 at ¶ 11).

On January 12, 2020, Dr. Rajoli saw Mr. Saintignon for an appointment to address his chronic heartburn. (*Id.* at 4-6). By this time, Mr. Saintignon's hot and cold sweats had stopped, but he still had some lingering symptoms, such as headaches, chest pains and difficulty breathing. (Dkt. 51-8 at 8-9). Dr. Rajoli prescribed prednisone and an inhaler. (Dkt. 51-1 at 6).

According to Mr. Saintignon, "After the prednisone, the antibiotic, and the inhaler, everything kind of tapered off except difficulty breathing. Like I still have shortness of breath and

difficulty breathing to this day. I am still prescribed an inhaler for these same reasons." (Dkt. 51-8 at 9).

### F. Affidavit of Kenneth Kipp

Mr. Saintignon has submitted an affidavit from fellow prisoner Kenneth Kipp describing Mr. Kipp's his own experience with Covid-19 in the Control Unit. (Dkt. 61-1 at 9-13).

Around November 26, 2020, Mr. Kipp began experiencing sweating, chills, severe headaches, body aches, trouble swallowing, and difficulty breathing. (*Id.* at 9). Two days later, he received a Covid-19 test, which returned positive. (*Id.* at 9-10). He was given a 3-day supply of Tylenol but no other treatment. (*Id.* at 10). He did not receive regular checks by the medical staff; instead, his temperature was taken two or three times over about two weeks. (*Id.*). Even though Mr. Kipp was often too ill to get out of bed to receive his blood pressure medication, the med line nurses took no action to provide additional treatment. (*Id.* at 10-11). After about three weeks of receiving little to no treatment, Mr. Kipp was prescribed doxycycline and prednisone. (*Id.* at 11).

Mr. Kipp's affidavit also corroborates Mr. Saintignon's statement describing his interactions with the med line nurses:

> I heard Saintignon asking the nurses during med pass for anything to help with chest pains he was having and trouble breathing from Covid. He told the nurses that the Tylenol he got didn't help at all. Saintignon was in bad shape and all the nurse would say was 'just lay down and rest.' They refused to contact the doctor. The nurses were Taylor, Chantel, and Chelsey. I know this because they done me the exact same way.

(*Id.* at 13) (cleaned up).

### G. Affidavit of Marzono Shelly

Mr. Saintignon has also submitted an affidavit from fellow prisoner Marzono Shelly corroborating his statements about his interactions with the med line nurses. (Dkt. 61-1 at 14-15).

Mr. Shelly was in the cell next to Mr. Saintignon in December 2020 and January 2021, and he remembers Mr. Saintignon's illness. (*Id.* at 14). According to Mr. Shelly:

> I could hear Mr. Saintignon complaining to the nurses during med pass that he was begging for something to help with pain and he kept complaining that the Tylenol didn't help, and that he could not breathe due to having the Covid. The nurses always ignored Mr. Saintignon, and the nurses I remember Mr. Saintignon asking and being ignored by were the nurses named: Chantel and also Nurse Taylor.

(*Id.* at 14-15) (cleaned up).

### III. DISCUSSION

#### A.  Eighth Amendment Medical Standard

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, the Court assumes that Covid-19 and Mr. Saintignon's related symptoms amount to a serious medical need. To survive summary judgment then, Mr. Saintignon must show that the defendants acted with deliberate indifference—that is, that they consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

### B. Wexford

Because Wexford is a private corporation acting under color of state law (*i.e.*, providing medical care to state prisoners), it may be liable if Mr. Saintignon suffered a constitutional violation as a result of Wexford's widespread practice or custom if "it was obvious that Wexford's action would lead to constitutional violations, and that Wexford consciously disregarded those consequences." *Dean v. Wexford*, 18 F.4th 214, 235 (7th Cir. 2021) (cleaned up).

Wexford argues that the Court should grant summary judgment because Mr. Saintignon "has no evidence of any policies, practices, or procedures of Wexford that lead (*sic*) to a violation of his constitutional rights. Instead, the . . . medical records and undisputed material facts show that [he] received timely and thorough medical treatment." (Dkt. 50 at 15). The Court disagrees.

As an initial matter, the evidence shows that the treatment Mr. Saintignon received in December 2020 and early January 2021 was the standard care Wexford provided its patients suffering from Covid-19. After Mr. Saintignon displayed symptoms of Covid-19, he was given a Covid-19 test and six Tylenol. (Dkt. 61-1 at 4-9). No one monitored his symptoms or provided him with palliative care other than Tylenol. (*Id.*). Although med line nurses came by his cell twice daily for several weeks, they did not provide treatment, monitor his symptoms, or inform the rest of the medical staff of his worsening condition. (*See generally* dkts. 51-3, 51-4, 51-6). Instead, he was left in his segregated cell. It was only after his symptoms persisted for several more weeks that he finally received additional treatment, including an antibiotic, a steroid, and an inhaler. (Dkt. 55-1 at 4-9).

This course of treatment was effectively what Mr. Kipp received for his own Covid-19 symptoms in November and December 2020. (Dkt. 61-1 at 9-12); *see also Kipp v. Wexford of Indiana, LLC, et al.*, 2022 WL 4599140, (S.D. Ind. September 30, 2022) (Order granting in part,

denying in part defendants' motion for summary judgment based on the care Mr. Kipp received for Covid-19 in November and December 2020).

Further, Dr. Rajoli described this treatment as the typical course of treatment for patients with Covid-19. (Dkt. 51-2 at ¶ 8). And Dr. Byrd characterized his decision to provide Mr. Saintignon with Tylenol, and nothing else, on December 24, 2020, as "the standard treatment for COVID-19." (Dkt. 51-7 at ¶ 10).

Having found that Mr. Saintignon's treatment resulted from Wexford's custom or widespread practice for treating Covid-19, the Court next finds that this treatment fell below what is required by the Eighth Amendment. Wexford presents evidence, through its employees Dr. Byrd and Dr. Rajoli, that "there is no cure or standard treatment for COVID-19," and that while medications such as steroids, antibiotics, and inhalers "can be effective at treating symptoms of a respiratory infection" caused by Covid-19, these medications "are not considered effective at treating the underlying virus." (Dkt. 51-2 at ¶ 8, 18); (Dkt. 51-7 at ¶ 8, 16).

The Court is mindful that Covid-19 is a novel illness, that there are more treatment options today than there were in December 2020, and that existing treatments at that time may have been ineffective at treating the underlying viral infection. But that is beside the point. The touchstone of an Eighth Amendment analysis is whether the defendant was deliberately indifferent to the prisoner's *pain*—not the prisoner's viral load. *See Orlowski v. Milwaukee County*, 872 F.3d 417, 423 (7th Cir. 2017) ("A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."). Thus, whether a treatment was available to treat Mr. Saintignon's underlying viral infection is not dispositive; there may have been available treatments for his

painful symptoms that Wexford refused to provide without a legitimate medical or penological purpose, which might amount to deliberate indifference.

By Wexford's own admission, treatments for Mr. Saintignon's painful symptoms did exist. A physician eventually prescribed doxycycline, and Dr. Rajoli eventually prescribed prednisone and an inhaler after Mr. Saintignon's painful symptoms persisted for several weeks. (Dkt. 51-1 at 6); (Dkt. 55-2 at ¶12); (Dkt. 55-7 at ¶ 11). Wexford does not explain why it waited approximately four to six weeks to provide Mr. Saintignon with these medications (or why it failed to provide him with palliative remedies other than Tylenol), and no reason is apparent from the record.

Next, the Court finds that it was obvious that Wexford's standard treatment for Covid-19 would lead to constitutional violations, and that Wexford consciously disregarded those risks. The Covid-19 pandemic was in full swing by December 2020. It was common knowledge that this was a deadly illness accompanied by a host of painful symptoms that posed a serious threat to people living in congregate settings, such as prisons. Wexford's decision to provide its patients with a handful of Tylenol, to forgo other palliative remedies, to forgo checking on them at regular intervals, and to refuse to provide additional treatment unless symptoms persisted for weeks, predictably left its patients in prolonged pain, and led to care that fell below the requirements of the Eighth Amendment.

Finally, the Court addresses Wexford's argument that "the undisputed evidence reveals that the applicable COVID-19 policies were created by the Indiana Department of Correction, and were based upon direction from the Indiana Department of Correction, the Indiana Department of Health, as well as the Centers for Disease Control." (Dkt. 50 at 16). Aside from its non-specific references to "policies," *e.g.* dkt. 51-2 at ¶ 4, Wexford does not explain how its treatment of Mr. Saintignon was dictated by orders from IDOC. There is no evidence that IDOC policies, rather

12

than Wexford policies, dictated the prescribing decisions of Mr. Saintignon's physicians, the conduct of med line nurses, or the lack of palliative care options for patients with Covid-19.

Wexford has not provided the Court with a basis to grant summary judgment in its favor, and its motion for summary judgment is therefore **DENIED**.

### C.  Nurse Riggs

Nurse Riggs argues, "[f]irst and foremost," that Mr. Saintignon "can present no evidence, *besides his own sworn testimony*, that he encountered [Nurse Riggs] during the relevant time frame, nor reported his alleged symptoms to [her]. As such, he has no evidence that [Nurse Riggs] [was] personally involved in the alleged constitutional violation." (Dkt. 50 at 12) (emphasis added).

This argument is without merit. In one breath, Nurse Riggs states that Mr. Saintignon presents sworn testimony that he interacted with her and told her about his Covid-19 symptoms, and in the next breath, says that Mr. Saintignon presents no evidence that he interacted with her during this time frame. This argument is self-defeating, as witness testimony, including the plaintiff's own testimony, may defeat a motion for summary judgment. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("We begin by noting that the district court discredited Hill's testimony about his interactions with coworkers because of its 'self-serving' nature. This was error. Deposition testimony, affidavits, responses to interrogatories, and other written statements are by their nature are self-serving. As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (internal citations removed).

Nurse Riggs next argues that "if Plaintiff had presented to [her], complaining of an upper respiratory infection, [she] would have instructed him to submit a health care request form, as was the proper procedure for requesting medical care in non-emergent situations." (Dkt. 50 at 13).

This argument is unpersuasive and circular. Mr. Saintignon interacted with Nurse Riggs on December 10, 2020, after he had already submitted a Request for Health Care form on December 8, 2020, complaining of Covid-19 symptoms. (Dkt. 61-1 at 16) ("For about the last 3-4 days I've been having a really high fever (hot + cold chills) and coughing as well as shortness of breath."). It makes little sense that a patient could submit a Request for Healthcare form and then be told by the nurse assigned to his case that he cannot receive treatment or see a physician until he submits a Request for Healthcare form. Such *Through the Looking Glass* logic would doom patients to a perpetual cycle of requesting, but never receiving, appropriate medical care.

Nurse Riggs next argues that "there is no evidence that Plaintiff had symptoms or a condition that was so significant or serious, that [Nurse Riggs] need (*sic*) to stop medication line to address an emergent condition." (Dkt. 50 at 13).

This argument is without merit. First, Mr. Saintignon did not interact with Nurse Riggs at med line; he interacted with her during his Covid-19 test. (Dkt. 61-1 at 4) (Saintignon declaration); (Dkt. 51-8 at 7) (Saintignon deposition). Second, the Centers for Disease Control and Prevention ("CDC") states that Covid-19 patients with trouble breathing or persistent pain or pressure in the chest should seek emergency treatment. (*Supra* at Part II-A). At the very least, this CDC guidance creates a genuine dispute of fact over whether Mr. Saintignon's symptoms demanded prompt action by Nurse Riggs.

Nurse Riggs next argues that she was not deliberately indifferent because she is not a physician and thus "had no legal authority to diagnose Plaintiff or order specific medical treatment." (Dkt. 50 at 13).

This argument is unpersuasive. Perhaps Nurse Riggs was not authorized to diagnose Mr. Saintignon or order specific treatment, but as a member of the medical staff, she could have communicated Mr. Saintignon's medical distress to one of the facility's multiple onsite physicians. Instead, she told Mr. Saintignon that all the physicians were too busy to see him. (Dkt. 51-8 at 7); (Dkt. 61-1 at 4). The evidence supports a reasonable conclusion that there was more she could have done, even without being a licensed physician.

Nurse Riggs has not provided the Court with a basis to grant summary judgment in her favor, and her motion for summary judgment is therefore **DENIED**.[4]

### D.  Med Line Nurses (Pearison, Chelsey, and Hill)

The med line nurses make the exact same arguments as Nurse Riggs. (Dkt. 50 at 12-13). The Court reiterates that Mr. Saintignon's sworn declaration and deposition testimony may be used to defeat a motion for summary judgment. *Hill*, 724 F.3d at 967. The Court further observes that

---

[4] Nurse Riggs raises the following argument for the first time in her reply brief: "Even if we give Plaintiff the benefit of all reasonable inferences, and assume he was face-to-face with Defendant Riggs on December 10, 2020 and reported symptoms directly to her,"—a modest concession, as this is precisely what is required on summary judgment—"there would still not be a triable issue of fact because we know Plaintiff saw a physician five (5) days later on December 15, 2020, and there was no indication, notation, diagnosis, or reference to Mr. Saintignon requiring any immediate or urgent care and treatment." (Dkt. 62 at 3). This argument implies that five days after seeing Nurse Riggs, Mr. Saintignon saw a physician and was fine, yet there is ample evidence that his symptoms persisted, and perhaps even worsened, in the five days after he saw Nurse Riggs, and that he reported these severe and persistent symptoms to Dr. Rajoli at the December 15 appointment. (Dkt. 51-8 at 7-8); (Dkt. 61-1 at 5, 9-15). In any event, "[i]n most instances, litigants waive any arguments they make for the first time in a reply brief," and this case is no exception. *Liberty Mutual Fire Insurance Company v. Clayton*, 33 F.4th 442, 449 n.4 (7th Cir. 2022). As such, this argument, raised for the first time on reply, does not provide a basis to grant summary judgment for Nurse Riggs.

Mr. Saintignon's statements about his interactions with the med line nurses are corroborated by the affidavits of Kenneth Kipp and Marzono Shelly. (Dkt. 61-1 at 9-15).

The Court also finds that there is a material factual dispute about whether the med line nurses could have told a physician or another member of the medical staff that Mr. Saintignon had serious and persistent Covid-19 symptoms. The Court is mindful of the division of labor within prisons and the need for the med line nurses to administer patient medication in an efficient manner. But the med line nurses have not explained why they did not communicate Mr. Saintignon's worsening condition *after med line was complete*. Presumably, reporting his condition after med line was complete would not have kept the med line nurses from completing med line accurately and efficiently.

The Court finds there is also a material factual dispute about whether the med line nurses should have stopped what they were doing during med line to address Mr. Saintignon's Covid-19 symptoms. The CDC states that Covid-19 patients with trouble breathing or persistent pain or pressure in the chest should seek emergency medical attention, and the med line nurses state that when faced with an emergency medical situation, they will "stop what [they] [are] doing and address the emergent need immediately," even during med line. (*Supra* at Part II-A); (Dkt. 51-3 at ¶ 8); (Dkt. 51-4 at ¶ 13); (Dkt. 51-6 at ¶ 13).

The med line nurses have not provided the Court with a basis to grant summary judgment in their favor, and their motion for summary judgment is therefore **DENIED**.

### E.  Treating Physicians (Dr. Rajoli and Dr. Byrd)

#### 1.  Dr. Rajoli

In the opening brief, Dr. Rajoli argues that he is entitled to summary judgment because he was unaware that Mr. Saintignon was experiencing severe Covid-19 symptoms at the appointment

on December 15, 2020, and that during his next appointment with Mr. Saintignon on January 12, 2021, he prescribed prednisone and an inhaler, which alleviated his symptoms. (Dkt. 50 at 13-14). In support of this argument, Dr. Rajoli stated, "At the time of [the December 15] encounter, Plaintiff had not submitted any health care request forms complaining of difficulty breathing or chest pain." (*Id.* at 13). Dr. Rajoli also stated that during the December 15 appointment, "Dr. Rajoli observed nothing that would have required any immediate or additional intervention." (*Id.*).

These statements do not accurately reflect the summary judgment record. Mr. Saintignon submitted a Request for Health Care form on December 8, 2023, complaining of shortness of breath. (Dkt. 61-1 at 16). Dr. Rajoli submitted other Request for Health Care forms in support of summary judgment, *see* dkt. 51-1 at 20-23, but the December 8 Request for Health Care form is noticeably absent from this exhibit. It was only submitted later, by Mr. Saintignon, in opposition to the motion for summary judgment. (Dkt. 61-1 at 16). Further, Mr. Saintignon testified in his deposition, and later stated in his declaration in opposition to summary judgment, that he told Dr. Rajoli during the December 15, 2020, appointment that he was experiencing chest pains and trouble breathing, and that Dr. Rajoli told him there was nothing he could do. (Dkt. 51-8 at 8); (Dkt. 61-1 at 5). Yet Dr. Rajoli does not mention this part of Mr. Saintignon's deposition testimony in his opening brief.

In his reply brief, Dr. Rajoli states, "At this point, there is obviously a dispute of fact. Plaintiff alleges that he informed Dr. Rajoli of these symptoms [on December 15], and Dr. Rajoli's note makes no reference to them." (Dkt. 62 at 4). Nevertheless, Dr. Rajoli argues that this factual dispute is not material because "there is no evidence that Plaintiff had a serious medical need for a specific intervention from Dr. Rajoli on December 15, 2020 for an incurable medical condition that did not have any established treatment plan." (*Id.*).

17

This argument is unpersuasive. On January 12, 2021, Dr. Rajoli prescribed prednisone and an inhaler to treat Mr. Saintignon's shortness of breath and chest pains. (Dkt. 55-1 at 4-6). Dr. Rajoli also states in his affidavit that he believes the decision to prescribe doxycycline on December 31, 2020, was "an appropriate step, given that Mr. Saintignon was reporting difficulty breathing with a productive cough and slight wheezing while exhaling, all consistent with an upper respiratory infection." (Dkt. 51-2 at ¶ 12).

This evidence shows that there were alternative treatments available besides Tylenol. Dr. Rajoli does not explain why he persisted in an ineffective course of treatment when other alternatives were available, and no reason is apparent from the record. The evidence permits a reasonable conclusion that Dr. Rajoli acted with deliberate indifference to Mr. Saintignon's Covid-19 symptoms at the December 15 appointment. *See Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("Persisting in treatment known to be ineffective can constitute deliberate medical indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective."); *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (summary judgment reversed where prison doctor "persisted with the TCAA treatment knowing it was not working and that Goodloe continued to suffer from severe rectal pain and ongoing bleeding"); *Petties v. Carter*, 836 F.3d 722, 732 (7th Cir. 2016) (summary judgment reversed where a prison doctor persisted in a providing patient with crutches, rather than immobilizing his ruptured tendon, when he "knew that failure to immobilize an Achilles rupture would impede Petties's recovery and prolong his pain").

Dr. Rajoli has not provided the Court with a basis to grant summary judgment in his favor, and his motion for summary judgment is therefore **DENIED**.

### 2. Dr. Byrd

Dr. Byrd seeks summary judgment "[f]or the same reasons as Dr. Rajoli." (Dkt. 50 at 15). Dr. Byrd argues that he "gave orders for Plaintiff to receive Tylenol and a chest x-ray, as well as Doxycycline. During his only relevant face-to-face encounter with Dr. Byrd, Plaintiff presented with no signs of ongoing difficulty breathing." (*Id.*).

This argument is unpersuasive. Dr. Byrd first appears in the summary judgment record on December 18, 2020. By that time, there was documentation that Mr. Saintignon's Covid-19 symptoms had persisted for fourteen days. (Dkt. 61-1 at 16); (Dkt. 51-1 at 11, 23). These symptoms included shortness of breath, chest pains, and other painful symptoms, for which Tylenol was ineffective. (*Id.*).

On December 18, 2020, a nurse examined Mr. Saintignon and reported, "Not feeling well, continues to have body aches, SOB." Later that day, Dr. Byrd "was contacted after Mr. Saintignon was assessed by a nurse due to his complaints of body aches and shortness of breath." (Dkt. 51-7 at ¶ 9). Dr. Byrd ordered a chest x-ray, and also ordered more Tylenol. (*Id.*). He did not provide alternative treatments. On December 24, 2020, Dr. Byrd learned that Mr. Saintignon was still in distress, and he ordered yet more Tylenol. (Dkt. 51-7 at ¶ 10).

The decision to prescribe doxycycline on December 31, 2020, and Dr. Rajoli's decision to prescribe prednisone and an inhaler on January 12, 2021, is evidence that alternative treatments were available. There is no evidence explaining why Dr. Byrd persisted in ineffective treatment when alternatives were available. As with Dr. Rajoli, the summary judgment record supports a reasonable conclusion that Dr. Byrd persisted in an ineffective course of treatment out of deliberate indifference to Mr. Saintignon's serious medical need. *Thomas*, 991 F.3d at 772 (7th Cir. 2021).

Dr. Byrd has not provided the Court with a basis to grant summary judgment in his favor, and his motion for summary judgment is therefore **DENIED**.

### IV. Conclusion

For the reasons explained above, the defendant's motion for summary judgment, dkt. [49], is **DENIED**.

In his response and surreply in opposition to the defendant's motion for summary judgment, Mr. Saintignon states that he believes he is entitled to judgment as a matter of law. However, his response brief does not contain a section titled "Statement of Material Facts *not* in Dispute," as required by Local Rule 56-1(a), and he does not identify his response as a cross-motion for summary judgment. Further, he did not move for summary judgment by the February 17, 2023, deadline. (*See* dkt. 44). Finally, there remain genuine disputes of material fact precluding summary judgment (*e.g.*, whether Mr. Saintignon disclosed his Covid-19 symptoms to Dr. Rajoli at the appointment on December 15, 2020; whether Mr. Saintignon interacted with Nurse Riggs during his Covid-19 test on December 10, 2020; why Dr. Rajoli and Dr. Byrd persisted with Tylenol rather than trying alternative treatments; whether it was feasible for the med line nurses to address Mr. Saintignon's severe Covid-19 symptoms during med line or communicate those symptoms after med line was complete). Accordingly, Mr. Saintignon's request for summary judgment is **DENIED**.

This matter will be resolved at a settlement conference or trial. Given the challenges inherent in late-stage litigation, Mr. Saintignon would likely benefit from the assistance of recruited counsel. Accordingly, the **clerk is directed** to send Mr. Saintignon a Motion for Assistance Recruiting Counsel form with his copy of this Order. Mr. Saintignon shall return a completed motion for assistance recruiting counsel form by **September 5, 2023**.

**IT IS SO ORDERED**.

Date: 8/11/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DANNY LEE SAINTIGNON, Jr.
978030
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

All Electronically Registered Counsel